COMMONWEALTH *vs.* ERNEST ALLEN.

Hampden. April 8, 1986. — June 23, 1986.

Present: GREANEY, C.J., ARMSTRONG, & SMITH, JJ.

*Robbery. Identification. Evidence,* Cross-examination, Sound recording,
   Prior conviction. *Witness,* Impeachment. *Habitual Offender.*

At a robbery trial, the victim's out-of-court identification of the defendant's
   photograph from an array of five photographs shown him several days
   after the incident was properly admitted in evidence, even though, in a
   telephone conversation with the victim before he was shown the photo-
   graphs, a police detective had indicated that the array would include a
   photograph of a man whom the victim had named as one of his assailants.
   [416-417]
At a robbery trial in which the principal contested issue was the victim's
   ability to identify the defendant as one of his assailants, the judge erred
   in excluding a partial transcript of a telephone conversation, occurring
   the day after the incident, between the victim and a police emergency
   operator, which the defense had offered in evidence for the purpose of
   impeaching the victim's testimony that he had given the operator the
   first name of a man he recognized as one of the robbers; the incomplete-
   ness of the transcript was, in the circumstances, a factor to be considered
   by the jury in determining its weight as evidence, but did not render it
   inadmissible. [420-423]
At the trial of a defendant charged under G. L. c. 279, § 25, with being a
   habitual criminal, the evidence, including testimony by a court clerk
   and police officers, as well as prior indictments bearing the clerk's
   notations as to their disposition, was sufficient to permit the judge, as
   trier of fact, to conclude beyond a reasonable doubt that the defendant
   had been twice convicted and committed to prison as required by § 25,
   and it was not necessary for the Commonwealth to introduce the mittimus
   involved in the execution of each of the two prior sentences. [423-424]
A defendant's sentence and commitment to the Massachusetts Correctional
   Institution, Concord, for a term of three years or more constitutes a
   prior conviction for purposes of G. L. c. 279, § 25, a statute providing
   for the punishment of habitual criminals. [425]

INDICTMENT found and returned in the Superior Court De-
partment on February 11, 1983.

A charge of robbery was tried before *John F. Moriarty,* J., and a charge of being a habitual criminal was thereafter heard by him without jury.

*James M. Smith* for the defendant.

*Brett J. Vottero,* Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. The defendant was convicted by a jury in the Superior Court of unarmed robbery.[1] G. L. c. 265, § 19. Following the conviction, the defendant proceeded to trial, before the judge who had presided at the jury trial, on the additional charge of being a habitual criminal. G. L. c. 279, § 25. The judge found the defendant guilty of that offense. Pursuant to the requirement in G. L. c. 279, § 25,[2] the defendant was sentenced to life imprisonment at M.C.I., Cedar Junction, the maximum penalty prescribed in G. L. c. 265, § 19, for unarmed robbery. On appeal, the defendant argues error: with respect to the robbery conviction, in the denial of his motion to suppress his identification, and in the exclusion of evidence designed to impeach the victim's testimony on the issue of identification; and, with respect to the habitual criminal conviction, in the denial of his motion for a required finding of not guilty.

1. *The motion to suppress.* The circumstances of the crime and the defendant's identification were as follows. On September 23, 1982, at about 6:30 P.M., Edward Plummer and his employer closed up the Springfield market where Plummer was employed. Plummer's employer gave him a ride up State

---

[1] The indictment upon which the conviction was returned charged the defendant with armed robbery under G. L. c. 265, § 17.

[2] General Laws c. 279, § 25, provides as follows:

"Whoever has been twice convicted of crime and sentenced and committed to prison in this or another state, or once in this and once or more in another state, for terms of not less than three years each, and does not show that he has been pardoned for either crime on the ground that he was innocent, shall, upon conviction of a felony, be considered an habitual criminal and be punished by imprisonment in the state prison for the maximum term provided by law as a penalty for the felony for which he is then to be sentenced."

Street and dropped him at a bar known as the Charm Cafe. After having a couple of beers at that establishment, Plummer went to a fast food restaurant, where he purchased a few pieces of chicken. He then walked down State Street and on to Wilbraham Road, eating the chicken along the way, to another bar known as the Elks or Harmony Lounge. As he entered that establishment, Plummer met the defendant, whom he had known for a couple of years, but only by the name of "Ernest." The defendant told Plummer that a friend, "Joe," had asked the defendant to tell Plummer that "Joe" would be waiting for him at Megan's Cafe. Megan's Cafe is located on State Street about a block from the Harmony Lounge. Plummer immediately left the Harmony Lounge and walked to Megan's in search of "Joe."[3] When Plummer arrived at Megan's, "Joe" was nowhere to be found. He looked for Joe's car but was unable to find it anywhere nearby.

After a stop at a pizza parlor, Plummer started toward his home at about 9:00 P.M. Street lights provided some dim illumination. As Plummer neared his home, he was suddenly seized from behind by a man who said, "Give it up!" Plummer testified that he recognized the voice as the defendant's. While Plummer was being held from behind, a second man confronted him, reached into his pocket and took his money. He did not recognize the second man but did notice what appeared to be a shiny object in his hand. At that moment the man in front of him said, "Cut him!" Plummer dropped to one knee and spun around so that he was able to confront his assailant, whom (as he testified) he recognized as the defendant. Plummer broke away and ran to his home.

---

[3] Plummer also testified that he had been introduced to the defendant by "Joe" about two years earlier at another bar. The meeting had been a casual one, and the defendant had been introduced only as "Ernest" without benefit of a surname. After that introduction, Plummer saw the defendant a number of times in Springfield and learned they had friends in common. However, until after the night in question, Plummer had never heard, or had occasion to learn, the defendant's last name.

Plummer did not call the police until the next day, September 24.[4] On that morning, he called the police department's emergency telephone number, 911, and gave an account of the robbery to a police cadet. After this call, Plummer spread word about the robbery around the neighborhood and made inquiries in an effort to ascertain the defendant's last name.

Plummer testified that several days later he learned that the last name of the man he knew as "Ernest" was "Allen." He again called the 911 line at police headquarters and was referred to Detective Joseph Assad at the detective bureau. Plummer told Detective Assad about the robbery, stating that he had recognized one of the assailants as a man he knew only as "Ernest" and that he had just learned that Ernest's last name was "Allen." Assad indicated that he knew an Ernest Allen and would soon be up to see Plummer to show him a picture of Allen.

Later that same day, Detective Assad visited Plummer at the market. He brought with him five photographs, including a photograph of the defendant. The photographs were laid out on a countertop, and Plummer was asked whether he recognized anyone. Plummer immediately picked out the defendant's photograph.

The foregoing account is taken from the thorough findings of fact made by the judge on the motion to suppress. The findings are fully supported by the evidence and must stand. *Commonwealth* v. *Correia,* 381 Mass. 65, 76 (1980). On these findings, the judge could properly conclude (as he did) that the photographic identification procedure arranged by Detective Assad was not impermissibly suggestive. The detective neither said nor did anything to direct Plummer's attention to the defendant's photograph, and the five photographs are sufficiently similar in appearance to constitute a fair array. The judge noted that "[i]t would have been better if the array had been larger and if Detective Assad had not made the remark

---

[4] Plummer had no telephone in his apartment, and his landlord, who lived on the first floor of the house in which he resided, was not at home on the evening of the assault.

that he did make on the telephone" but concluded that "there was nothing so improper about the procedure as would deprive the defendant of due process." We agree with the judge's observation as to the detective's remark and his ultimate assessment of the constitutional adequacy of the identification procedure. There was no error in the denial of the motion to suppress.

2. *Exclusion of impeaching evidence in the robbery trial.* Plummer's testimony at the trial repeated the circumstances of the crime and the resulting investigation substantially as recounted above, adding that $15 had been taken in the robbery. Plummer's identification of the defendant at the trial was strong and unequivocal, and included testimony that he: (a) had been acquainted with the defendant for years; (b) had seen and spoken with him in the neighborhood and at work on several occasions; (c) had immediately recognized the defendant's voice at the time of the robbery and had looked him "dead in the face" during the incident; (d) had given the police cadet who had received his 911 telephone call the day after the robbery the defendant's first name as "Ernest" or "Ernie"; and (e) had learned a few days later that the defendant's last name was "Allen." Plummer's trial testimony was supported by testimony from Joseph W. Major, Sr. (said by Plummer to be the "Joe" mentioned by the defendant as waiting for him at Megan's Cafe), Detective Assad, and the police cadet. Major testified that he had never told the defendant to send Plummer to Megan's. Detective Assad testified that Plummer had told him that the name of one of the robbers was "Ernest Allen" and that Plummer had immediately selected the defendant's photograph from the array shown to him. The police cadet testified that she had taken the 911 telephone call from Plummer and that Plummer had told her that he knew one of the men who had robbed him and that the man's first name was "Ernie" or "Ernest." The defendant's trial counsel made little headway in cross-examination in refuting this formidable identification testimony.[5] The defendant did not testify in his own behalf.

---

[5] The defendant's trial counsel impeached the police cadet by means of her brief written report of the 911 telephone call, which does not note that

It is with the identification testimony in this posture that we come to the evidence which the defendant's trial counsel offered to impeach Plummer. That evidence consisted of a typed transcript of the 911 telephone call made by Plummer to the police station on September 24, 1982. The transcript was made from a copy of the tape which had recorded the conversation. It was undisputed that some portion of the conversation was missing from the tape (through no fault of the police), but that the transcript accurately reported so much of the conversation as had been preserved. The relevant material in the conversation is set forth in the margin.[6]

Plummer had said he knew one of the robbers as "Ernie" or "Ernest." The cadet testified that she had forgotten to include this information in her report and had been reprimanded for her oversight.

[6] The conversation began and continued as follows:

PLUMMER: "must have been about 10:30 or 11:00."
POLICE CADET: "Yeah?"
PLUMMER: "And I headed home, and two guys jumped me; one hit and the other one had knife."
POLICE CADET: "Did you call the police?"
PLUMMER: "Well, I went home. I didn't have no telephone so I was afraid to come back out, you know. So I figured I'd just report it, you know."
POLICE CADET: "Where was this at?"
PLUMMER: "This was on Westford Ave."
POLICE CADET: "What street?"
PLUMMER: "Westford Avenue."
POLICE CADET: "Westford?"
PLUMMER: "Right."
POLICE CADET: "And there was two men, right?"
PLUMMER: "Right."
POLICE CADET: "What did they look like?"
PLUMMER: "Oh, they both was black, I guess, one was sort of heavy and the other one was sort of, I don't know, maybe five nine or something like that."
POLICE CADET: "What were they, young or old or what?"
PLUMMER: "Well, I guess they was sort of young. I couldn't see them too well at night."
POLICE CADET: "In their twenties, thirties, forties?
PLUMMER: "Right."
POLICE CADET: "Which one, twenties?"
PLUMMER: "Yeah, in the twenties. One guy was in the twenties, the other guy in the late thirties, I guess."
POLICE CADET: "Okay, you say one had a knife?"

The defendant's trial counsel attempted twice at the trial to introduce the material. The first time occurred in cross-examination of Plummer when the material was offered to impeach the credibility of Plummer's identification. The judge excluded the offer on the basis that Plummer's answers in the telephone conversation may not have been inconsistent with his trial testimony because Plummer might have stated that he knew his assailant as "Ernest" or "Ernie" in the missing portion of the conversation. The judge indicated, however, that he would reconsider his ruling after he had an opportunity to listen to the tape. After the tape was produced the defendant's trial counsel renewed his offer to introduce the transcript. The judge made a final ruling excluding it.[7]

---

PLUMMER: "Yes."
POLICE CADET: "And one is heavy and one is thin, right?"
PLUMMER: "Right."
POLICE CADET: "Which one's heavy, the younger one?"
PLUMMER: "The one that — yeah, I would say the one that hit me was the heaviest one."
POLICE CADET: "Okay. And what's your name, sir?"
PLUMMER: "Edward. Edward Plummer."
POLICE CADET: "How do you spell your last name, sir?"

[In the balance of the conversation Plummer indicated how he could be reached and repeated some details of the robbery which do not involve the issue of identification.]

[7] The following discussion took place with regard to the second offer:
THE DEFENDANT'S COUNSEL: "Your Honor, the next thing I have is in putting on a defense I would again move for admission of the transcript, and, again, I would ask that the tape which I have here and which we have all listened to, if we can stipulate it is an accurate —"
THE JUDGE: "Yes, I listened to the tape, the record may show, in the lobby, it starts off just where the transcript starts off and precisely the same language."
THE DEFENDANT'S COUNSEL: "I would, nonetheless, move for the admission and make the argument that it should go to its weight and not to its relevancy as to what is missing from the tape."
THE JUDGE: "I am not going to admit it because it is quite obviously incomplete. What happened, why the first part of the conversation was not recorded on the tape, I have no idea, as it is evident from the tape itself that something happened, something was said before the tape started recording. For that reason I am not going to admit it."

"'[A] fair and full cross-examination to develop facts in issue or relevant to the issue is a matter of absolute right and is not a mere privilege to be exercised at the sound discretion of the presiding judge, and the denial of the right is prejudicial error.'" *Commonwealth* v. *Johnson,* 365 Mass. 534, 543 (1974), quoting from *Gossman* v. *Rosenberg,* 237 Mass. 122, 124 (1921). See also *Commonwealth* v. *Nicholas,* 15 Mass. App. Ct. 354, 355 (1983). This principle necessarily encompasses the "right to prove statements inconsistent with [a witness's] testimony," and "cannot be denied by the judge when the testimony bears directly upon a material and not collateral issue in the case . . . ." *Assessors of Pittsfield* v. *W.T. Grant Co.,* 329 Mass. 359, 360 (1952), and cases cited.

We have no doubt that the excluded evidence bore on a material issue. When identification is controverted, the importance of the victim's opportunity to identify his assailant at the scene of the crime cannot be underestimated. That opportunity will most likely be scrutinized by the jury to see if an identification based upon observations at the time of the crime is reliable. If the initial identification is found to be trustworthy, it will also probably enhance the weight to be given by the jury to subsequent identifications by the victim, such as the photographic identification that occurred in this case. Moreover, common sense indicates that a jury will probably consider as convincing any initial identification which is rooted in the victim's apprehension of individualizing physical characteristics of a defendant such as voice, smell, body type or clothes. The initial identification is all the more strengthened if it is shown that the victim and the defendant knew each other.

Here, the principal contested issue at trial concerned Plummer's ability to identify the defendant. The Commonwealth's evidence on the issue was powerful. That proof tended to show that the defendant may have used a subterfuge to lure Plummer back to the vicinity of Megan's Cafe as part of a plan to set him up for a robbery. It further indicated that on the basis of prior contacts with the defendant, Plummer immediately identified him as one of his assailants, and reported to the police the next day what could have been found by the jury to be a

highly reliable identification. Plummer's identification testimony, supported by the other police testimony, went largely uncontradicted at trial. The excluded evidence, on the other hand, if it had been introduced and accepted by the jury, could have substantially undermined Plummer's identification by tending to show that he never really saw his assailants and had no idea who they were.[8] Realistically appraised, the evidence presented about the only chance the defendant had to create a reasonable doubt in a prosecution in which he faced (and ultimately received) a sentence of life imprisonment.

The judge initially excluded the evidence on the ground that the missing portion of the recording could very well have contained Plummer's identification of the defendant as "Ernie" or "Ernest," as Plummer had testified at the trial.[9] The judge's final ruling on the evidence, see note 7, *supra,* was to the effect that the evidence, because of incompleteness, might be too untrustworthy to be admitted. A trial judge, of course, has

---

[8] We also think that the evidence could have been found by the jury to create an inconsistency with Plummer's trial testimony. "[I]t is not necessary that there should be a contradiction in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict." *Commonwealth* v. *West,* 312 Mass. 438, 440 (1942). See *Commonwealth* v. *Hesketh,* 386 Mass. 153, 160-161 (1982).

[9] The Commonwealth argues that the partial recording could have been excluded because it could not be authenticated. The problem, as we see it, is not one of authentication. It was established or uncontested: (1) that the portion of the recording which had not been lost accurately reflected in the typewritten transcript the exact words of the conversation between Plummer and the police cadet who took his 911 telephone call; (2) that no changes, additions, or deletions had been made in the recording; (3) that the recording had been properly preserved (and that the loss of a portion of it was not attributable to fault on the part of the Commonwealth); and (4) that the conversation was made voluntarily and in good faith. These considerations satisfy the criteria for the authentication of this kind of evidence, see *United States* v. *McKeever,* 169 F.Supp. 426, 430 (S.D. N.Y. 1958); see also *United States* v. *Acavino,* 467 F. Supp. 284, 285 (E.D. Pa. 1979), and together with the considerations governing relevancy that have been previously discussed, also satisfy the authentication criteria for the admission of an audio recording. See *Commonwealth* v. *Gordon,* 389 Mass. 351, 354-356 (1983).

discretion to exclude this type of evidence on the ground that the evidence might mislead or confuse the jury. See *United States* v. *Avila,* 443 F.2d 792, 795 (5th Cir.), cert. denied, 404 U.S. 944 (1971). The measure of the judge's discretion has been put in these general terms: "The task of the trial court, in determining whether to admit tape recordings into evidence which contain [missing or] inaudible portions, is to assess whether the . . . portions are 'so substantial, in view of the purpose for which the tapes are offered, as to render the recording as a whole untrustworthy.'" *United States* v. *Bell,* 651 F.2d 1255, 1259 (8th Cir. 1981), quoting from *United States* v. *Young,* 488 F.2d 1211, 1214 (8th Cir. 1973).

In this case, unlike perhaps some others in which the lack of substantiality in the evidence is primarily dependent on the trial judge's examination, the concept of discretion is circumscribed by the fact that we are in about the same position as the trial judge to make the appropriate evaluation. We have an authenticated transcription of the recording and the testimony at trial against which its probative value is to be measured. We note that, in circumstances like those in the present case, several State and Federal appellate courts have dealt with the problem by applying a test similar to the one enunciated by the court in *Bell,* and with the limitation of discretion that has been described above. These decisions, as a general proposition, favor admission of the evidence (with a full explanation of its defects) when it would be of some practical value in the jury's resolution of relevant issues. The basis of these decisions is the thought that the common sense of the jury can be trusted to evaluate the parties' contentions and to give to the evidence the weight that they think it deserves. See, e.g., *Bentley* v. *State,* 397 P.2d 976, 979 (Alaska 1965) (that a transcript of a tape recorded telephone conversation contained only part of the conversation is only one factor for the jury to consider in determining its weight for impeachment; trial judge's finding that the recording was unreliable reversed); *State* v. *Steinbrecher,* 409 So. 2d 510, 511-512 (Fla. Dist. Ct. App. 1982) (partial inaudibility of a tape recording insufficient ground for excluding otherwise properly admissible evidence;

order excluding recording quashed); *Seymour* v. *Gillespie,* 608 S.W.2d 897, 899 (Tex. 1980) (error for trial judge to exclude partially inaudible tape recording, much of which was understandable, where it was the only "unbiased evidence"). See also *Gorin* v. *United States,* 313 F.2d 641, 652 (1st Cir. 1963), cert. denied, 374 U.S. 829 (1963) (appellate court examined transcription of tape recordings and concluded that "inaudible parts are [not] so substantial as to make the rest more misleading than helpful"); *United States* v. *Bell, supra* (trial judge properly admitted partially inaudible tape recordings, giving opponent opportunity to offer his version of the inaudible portions). See also (in an analogous area) the inquiry suggested for the jury in Fed. R. Evid. 1008, and the discussion in McCormick, Evidence 138-139 (3d ed. 1984).

As has been discussed, the evidence excluded in this case was obviously relevant to a principal issue. The need for the evidence could be considered critical in order to assure the defendant a fair trial. The jury could easily have been acquainted with the Commonwealth's contention about the information allegedly contained in the missing portion of the conversation and the circumstances leading to its omission. We think the jury would not have been confused or misled by the controversy over the recording and that they could have resolved ambiguities in a manner consistent with their usual function of deciding the weight to be given to the evidence. We conclude that the judge erred by excluding the evidence.[10]

3. *The habitual criminal conviction.* The defendant argues that he was entitled to a required finding of not guilty on the habitual criminal charge because (1) the Commonwealth failed to prove that he had been "twice committed to prison in this . . . state" for previous convictions as required by G. L. c. 279,

---

[10] We reject the Commonwealth's argument that the error is harmless because the defendant made the point he sought to establish with Plummer by impeachment of the police cadet with the fact that her written report of the telephone call contained no reference to the defendant's first name. It is obvious to us that the impeachment by the material which was excluded could be far more probative than the impeachment of the police cadet, and, if permitted, could have created a reasonable doubt in the jurors' minds.

§ 25, see note 2, *supra*; (2) the Commonwealth failed to prove that the defendant's two previous commitments had been "for terms of not less than three years each," as required by the statute; and (3) his sentence and commitment to the Massachusetts Correctional Institution at Concord for one of the two previous convictions cannot constitute a prior conviction under the statute.

(a) An assistant clerk of the Superior Court in Hampden County testified that the defendant had been sentenced, and committed, on September 26, 1967, for a term of five years and one day at M.C.I., Concord, on his conviction for being privy to assault and battery with intent to maim and disfigure by means of a dangerous weapon; and that he had been sentenced, and committed, on October 27, 1969, to M.C.I., Walpole, for a term of not more than twelve and not less than seven years on his conviction of manslaughter. The indictments containing the clerk's entries of these dispositions, including the orders of commitment, were placed in evidence. A Springfield police officer and Detective Assad also testified that they were familiar with the defendant, these charges, and their dispositions. This evidence was sufficient to permit the judge, who was sitting alone as the fact finder, to infer beyond a reasonable doubt, see *Commonwealth* v. *Basch,* 386 Mass. 620, 622 (1982), that the defendant had been twice convicted of felonies and twice actually committed to prison, as required by G. L. c. 279, § 25. Contrary to the defendant's contention, it was not necessary for the Commonwealth to introduce the mittimuses involved in the execution of the two sentences to prove the commitment element of G. L. c. 279, § 25.

(b) The defendant's further contention, that he had to actually serve at least three years on each prior felony conviction before he could be sentenced as a habitual criminal, has been disposed of adversely to him in *Commonwealth* v. *Tuitt,* 393 Mass. 801, 812 n.11 (1985).[11]

---

[11] The defendant's contention that his conviction as a habitual criminal violates the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights is also answered in *Tuitt* at 813-814.

(c) The defendant's last contention is that a sentence and commitment to M.C.I., Concord, for a term of three years or more cannot qualify as a prior conviction under G. L. c. 279, § 25. He argues that "under a schedule promulgated by the parole board, a prisoner at Concord is eligible for parole between six months and two and one-half years. Consequently, there is no possibility a Concord prisoner will directly serve three years." This contention is in error, because eligibility for parole does not require the Parole Board to grant parole. It is possible for a prisoner to serve in excess of three years on a Concord sentence. To the extent that the defendant contends that a sentence to M.C.I., Concord, for a felony conviction will not qualify as a sentence to a "prison," as that word is used in the habitual criminal statute, we note (i) the inclusion of Concord as a "state correctional facility" in G. L. c. 125, § 1(n), the statute governing the administration of the correctional institutions of the Commonwealth, and (ii) the dictum in *Sturtevant* v. *Commonwealth,* 158 Mass. 598, 600 (1893), which indicates that a sentence to Concord for the three-year term required by the habitual criminal statute is a sentence that counts under the statute. The possible unfairness of considering a Concord sentence for purposes of the habitual offender act, as thoughtfully developed by the judge in his posttrial memorandum, would appear to be a matter for the Legislature to consider. On the present language of G. L. c. 279, § 25, we must reject the contention.

4. *Disposition.* The judgment of the defendant's conviction of unarmed robbery is reversed, and the verdict is set aside. If the defendant is retried and convicted again of unarmed robbery, his conviction as a habitual criminal is to stand. If the defendant is either not retried or is acquitted of unarmed robbery, his habitual criminal conviction is to be vacated in the Superior Court and that charge is to be dismissed. In view of the circumstances, the retrial should be prompt. Consideration of when the retrial should occur, and bail in the interim, is to be had in the Superior Court.

*So ordered.*