COMMONWEALTH vs. DARRELL F. DAY.

No. 95-P-40.

Franklin. December 2, 1996. - February 21, 1997.

Present: BROWN, PORADA, & LENK, JJ.

*Practice, Criminal,* Assistance of counsel, Judicial discretion, Motion to
suppress. *Judge. Evidence,* Photograph, Identification. *Identification.
Due Process of Law,* Identification.

At the trial of an indictment for assault and battery by means of a danger-
ous weapon, trial counsel's introduction of an unsanitized police flyer
depicting the defendant, in an effort to demonstrate that witnesses who
had seen the flyer thereafter made tainted identifications, created a
strong risk of prejudice to the defendant and trial counsel's action was
manifestly unreasonable; further, the judge created a substantial risk of
a miscarriage of justice by admitting the flyer in evidence without
exercising her discretion to sanitize it: the defendant was entitled to a
new trial. [245-247]

At the retrial of an indictment, if a certain photograph of the defendant is
offered in evidence it should be sanitized to purge it of any characteristics
suggestive of criminality and unrelated to the purpose for which it
would be introduced. [247]

At the trial of an indictment, the judge erred in denying the defendant's
motion to suppress certain out-of-court identifications that were the
product of an impermissibly suggestive identification procedure arising
from witnesses' accidental but prolonged viewing of a photograph of the
defendant in a police flyer at the police station, however, the judge cor-
rectly concluded that subsequent in-court identifications of the defen-
dant by those witnesses had an independent source and were thus
properly admissible. [248-250]

INDICTMENT found and returned in the Superior Court
Department on June 11, 1992.

A pretrial motion to suppress evidence was heard by *Mary-
Lou Rup,* J., and the case was tried before her.

*Edward E. Eliot* for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the
Commonwealth.

PORADA, J. The defendant was convicted by a jury in the Superior Court of two counts of assault and battery by means of a dangerous weapon and of unlawfully carrying a firearm.[1] On appeal, he claims that the admission in evidence of (1) a police flyer containing the defendant's photograph and identifying the defendant as "armed and dangerous," a member of the devil's disciple gang, and the perpetrator of the crimes of assault and battery by means of a dangerous weapon and (2) a single photograph of the defendant that identified its source as the Greenfield police department and bore notations suggestive of possible unrelated criminal activity and the use of an alias by the defendant created a substantial risk of a miscarriage of justice. He asserts also that his counsel's introduction of the flyer as an exhibit and his failure to object to the Commonwealth's introduction of the single photograph, among other missteps, amounted to ineffective assistance of counsel. Lastly, he argues that the trial judge's denial of his motion to suppress the out-of-court and in-court identifications of the defendant by two witnesses following their exposure to the police flyer described above was error. We reverse.

The key issue at trial was the identification of the assailant who shot the victim twice in the leg. We summarize the evidence presented to the jury. The victim, Wayne Allen, his wife, and two of their friends, Donald and Eva Hubbard, went to the Victoria Bar in Greenfield on February 24, 1992. While Allen was conversing with an acquaintance at the bar, another man whom Allen did not know kept interrupting the conversation. After several verbal exchanges, the man invited Allen outside to fight. Allen left the bar with the man. When outside, before any blows were exchanged, Allen noticed a shiny object in the man's hand and decided to return to the bar. At that point, Allen was shot twice in the leg by this man. Allen reentered the bar and informed everyone that he had been shot. His assailant followed him back into the bar but, after speaking to someone, left the bar and drove away in a red car.

On that evening, Detective F. Peter Clarke of the Greenfield police department asked Allen and his wife to view a photographic array. Although the array contained a photo-

---

[1]Convictions of two additional counts were placed on file with the defendant's consent and are not before us.

graph of the defendant, neither Allen nor his wife identified anyone in the array as the assailant. In court, Allen identified the defendant as the man who shot him, stating that he "looked a little different than before"; however, his wife was unable to identify the defendant as her husband's assailant.

Also on the same evening as the shooting, Detective Clarke put together a second photographic array which he showed to a patron of the bar, Jerry Stokes. Stokes selected a photograph of the defendant from the array as Allen's assailant. Stokes told Detective Clarke that he had witnessed the shooting, but at trial Stokes admitted that he had never left the bar and that the photograph selected by him from the array was of the man he saw accompany Allen from the bar and return immediately after Allen stated that he had been shot. Stokes also identified the defendant at trial as that man. Detective Clarke had also shown the second array to the bartender, William Jamieson, who acknowledged that he selected a photograph from the array; at trial, however, the prosecutor did not elicit from Jamieson the identity of the person in the photograph. The bar owner, Perry Maniatty, also selected a photograph of the defendant from the array as a man he observed in the bar that night, but he had not seen the defendant in the bar after the shooting.

Seven to ten days after the shooting, the Hubbards went to the Greenfield police station to view a photographic array. The police were busy upon their arrival, and the Hubbards were asked to wait in the watch commander's room. As they sat in that room, Donald Hubbard called his wife's attention to a wanted poster on the wall, which contained the defendant's picture. Eva Hubbard remembered that the flyer had some writing on it such as Rutland Correctional Center. Donald Hubbard testified that there was no writing on the flyer. After waiting in that room for about twenty minutes, Detective Clarke asked them to view a photographic array to see if they could identify the man who had accompanied Allen outside and who returned to the bar immediately after the shooting. Both selected the defendant's photo from the array and identified the defendant at trial as this man. They both acknowledged that the photograph selected by them was the same one shown on the flyer. Eva Hubbard also described the assailant as about her height, five feet, eight inches tall, with a small build and dark hair, and wearing a baseball hat with initials D.D.M.C. on it.

John Maniatty, the son of the owner of the bar, viewed the shooting from an upstairs window overlooking the bar. He stated that the defendant was not the man who shot Allen but that it was possible that he told the police a fellow whose name was Dale or Darrell did. He stated that the shooter had on a baseball hat and had dark long hair. He acknowledged that he had met the defendant sometime after the shooting while both men were being held in jail.

Several other witnesses who observed the incident while walking on the street also testified. Michael Lemieux who was standing on the other side of the street at the time of the shooting testified that he could not distinguish the victim from the assailant except to say that the assailant had on a leather jacket with an eagle on it and left the bar after the shooting in a red car. Lemieux's companion, Bobbi Rivard, testified that she saw two men arguing, one was "rather small" and "was wearing a hat" and the other man was a "bigger guy . . . stocky." She saw the smaller man shoot the bigger man, the bigger man run into the bar, and the smaller man follow into the bar. She then saw the smaller man come out of the bar and jump into a red car. Chris Odle testified that he was standing behind the victim at the time of the shooting. He stated that the victim was about his height, five feet, nine inches, and that the assailant was slightly taller.

Detective Clarke testified to the out-of-court identifications made by the Hubbards, Stokes, Jamieson, and Perry Maniatty. Detective Clarke stated that Jamieson had selected the defendant's picture as the man who left the bar with Allen and followed Allen into the bar after the shooting.

Officer Zukowski also of the Greenfield police department testified that at the time of the defendant's booking the defendant stated that he was five feet, five inches tall, weighed one hundred and fifty-five pounds, and had brown hair and hazel eyes.

We now address the defendant's claims of error.

1. *Ineffective assistance.* The defendant contends that the judge created a substantial risk of miscarriage of justice in allowing the unsanitized police flyer viewed by the Hubbards to be admitted in evidence and that his trial counsel was ineffective by offering it in evidence. Because the standard for testing the ineffectiveness of counsel is not significantly different from the standard of a substantial risk of a miscarriage of

justice, see *Commonwealth* v. *Curtis,* 417 Mass. 619, 624 n.4 (1994), we consider both claims together.

There is no question that defense counsel introduced the unsanitized flyer to demonstrate that the out-of-court identifications and in-court identifications of the defendant by the Hubbards were tainted by their having viewed the flyer. In order for that strategy to amount to ineffective assistance of counsel, we must conclude that counsel's decision to do so was "manifestly unreasonable." *Commonwealth* v. *Rondeau,* 378 Mass. 408, 413 (1979). While we recognize defense counsel's need to attack the Hubbards' identifications and the introduction of the flyer was one means of doing so, we conclude that its introduction in an unsanitized form created a strong risk of prejudice to the defendant. Here, the flyer not only identified the defendant as responsible for the shooting but also indicated that he was "armed and dangerous" and a member of the devil's disciples gang. Compare *Commonwealth* v. *Cancel,* 394 Mass. 567, 572-573 (1985). The flyer also indicated that the source of the defendant's photograph was the Rutland Correctional Center, thus informing the jury that the defendant had a prior criminal record. See *Commonwealth* v. *Thayer,* 39 Mass. App. Ct. 396, 398 (1995). In addition, the flyer indicated that he was wanted for the crime of assault with intent to murder, which was not one of the charges for which he was on trial. Given the risk of the strong prejudice that this information would convey in a case in which there was conflicting evidence relating to the identity of Allen's assailant, we are unable to conclude that its offering by defense counsel without the sanitization of this information did not materially prejudice the defendant.

We also comment briefly on the role of the trial judge in its admission. Although the flyer contained significantly more prejudicial material than an unsevered mug shot, we liken it to a mug shot. We have repeatedly suggested that, once the need for the introduction of a mug shot in evidence has been demonstrated, a judge should exercise his or her discretion in determining the condition in which it is submitted to the jury. *Commonwealth* v. *Blaney,* 387 Mass. 628, 638 (1982). *Commonwealth* v. *Payton,* 35 Mass. App. Ct. 586, 592-596 (1993). We are of the opinion that a judge is not relieved of this obligation because the defendant or prosecution proffers the exhibit without objection.

Here, the judge's failure to purge the flyer of characteristics suggesting that the defendant had a prior record and propensity for criminality may have materially influenced the jury's appraisal of the identification testimony and thus resulted in a substantial risk of miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967).

We also agree with the defendant that defense counsel should have objected to Detective Clarke's testimony in which he stated that the bartender, Jamieson, had identified the defendant from an out-of-court photographic array as the person he saw leave the bar with Allen and then return to the bar after Allen reported he had been shot. See *Commonwealth* v. *Daye*, 393 Mass. 55, 62-63 (1984). Because the prosecutor never elicited testimony from Jamieson as to whose photograph he selected, Detective Clarke's testimony was inadmissible. *Ibid.*

2. *Other claims.* The defendant argues that the introduction of a single photograph of the defendant introduced by the Commonwealth in evidence without objection by defense counsel and published to the jury by defense counsel created a substantial risk of a miscarriage of justice and amounted to ineffective assistance of counsel because of the prejudicial notations on the back of the photograph. Because we have concluded that the defendant is entitled to a new trial, we need not go this far. For purposes of retrial, however, we note the following. The back of the photograph indicated that it came from the Greenfield police department, listed the crimes of assault and battery by means of a dangerous weapon and assault with intent to maim, gave a date of July 9, 1992, and disclosed that the defendant used an alias. The prosecutor introduced the photograph ostensibly to show that the defendant had changed his appearance from the date of the incident on February 24, 1992, and the defendant wanted to publish the photograph to demonstrate that he had not. There was, thus, a need to introduce the photograph, but the judge, the prosecutor, and defense counsel faltered in not sanitizing the back of the photograph to purge it of characteristics suggestive of criminality and unrelated to the Commonwealth's and the defendant's objective. *Commonwealth* v. *Gee*, 36 Mass. App. Ct. 154, 157-158 (1994). Compare *Commonwealth* v. *Thayer*, 39 Mass. App. Ct. at 398-400.

We decline to address the defendant's remaining claims in

light of our decision to award the defendant a new trial in which the alleged errors are unlikely to be repeated. In any event, the defendant's remaining claims do not rise to the appropriate level of appellate argument based on the defendant's failure to cite any legal authority in support of his claims. *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958). *Commonwealth* v. *Carpinto*, 37 Mass. App. Ct. 51, 52 n.1 (1994).

3. *Denial of motion to suppress identifications.* The defendant attacks the judge's denial of his motion to suppress the out-of-court and in-court identifications of the defendant on the ground that those identifications were tainted by viewing the flyer containing the defendant's photograph immediately prior to out-of-court identifications from a photographic array that contained the same photograph of the defendant. While an identification, based on a single show up, whether photographic or in person, of the defendant is disfavored, it is not subject to a per se exclusion but depends on the totality of the circumstances. *Commonwealth* v. *Storey*, 378 Mass. 312, 317 (1979). *Commonwealth* v. *Otsuki*, 411 Mass. 218, 234 (1991).

Here, the judge found that the viewing of the flyer by the Hubbards was accidental and not the result of design or police machinations. She made no finding as to the length of time the Hubbards stared at the flyer, but she did find that the Hubbards waited in the room in which the flyer was posted on the wall for twenty to thirty minutes. She also found that the out-of-court identifications were made seven to ten days after the incident. She also ruled that, even if she were to find them suggestive, the out-of-court identifications and any subsequent identifications were nevertheless reliable or based on an independent source because both Hubbards had had sufficient opportunity to observe the defendant in the bar prior to the incident and immediately after the incident under circumstances which would have caused his features to be fixed in their minds.

While the judge's subsidiary findings of fact[2] are binding upon us absent clear error, her application of law to the facts

---

[2]Although the motion judge indicated that she would make written findings of fact if requested, the only findings of fact presented to us are those contained in the transcript of the hearing on the motion to suppress. It would have been helpful if the parties had requested the motion judge to enlarge upon her findings.

found is open to review by us. *Commonwealth* v. *Melvin,* 399 Mass. 201, 204-205 (1987). Accidental confrontations, where the police make no attempt to elicit an improper identification, do not ordinarily result in suppression. *Commonwealth* v. *Otsuki,* 411 Mass. at 234. *Commonwealth* v. *Jones,* 423 Mass. 99, 104 n.5 (1996). Compare *Commonwealth* v. *Charles,* 4 Mass. App. Ct. 853 (1976). Nevertheless, as the Supreme Judicial Court pointed out in the *Jones* case, whether the identification process is unnecessarily suggestive and conducive to an irreparable mistaken identification should not turn simply on whether the police played a role in arranging the confrontation but rather on the totality of the circumstances surrounding the identification procedure. *Commonwealth* v. *Jones,* 423 Mass. at 109. Here, unlike what occurred in the *Otsuki* case, where a police officer's identification of the defendant was based on a chance encounter of a wanted poster containing the defendant's picture, the police flyer that the Hubbards were exposed to contained the same photograph of the defendant as appeared in the six-person photographic array from which they made their out-of-court identification; further, the flyer informed the viewer that the defendant on February 24 got into an altercation in a local bar in which he "invited the victim outside where he shot him twice." Given the Hubbards' opportunity to view this flyer for the twenty to thirty-minute period preceding their identification of the defendant's photograph in the photographic array displayed to them, we determine that the motion judge's implicit conclusion that the out-of-court identifications were not the product of an impermissibly suggestive process was clearly erroneous.

We cannot conclude that the out-of-court identifications were saved by the judge's determination that, even if this identification process were suggestive, the out-of-court identifications were nonetheless reliable. The defendant's motion to suppress was based on the State Constitution as well as the Federal Constitution. Under the due process clause of art. 12 of the Declaration of Rights, if the defendant establishes by a fair preponderance of the evidence that his identification was the subject of an unnecessarily suggestive procedure, the Commonwealth is barred from introducing that identification at trial without any consideration of whether that identification was reliable. *Commonwealth* v. *Botelho,* 369 Mass. 860, 867-868 (1976). *Commonwealth* v.

*Johnson*, 420 Mass. 458, 463 (1995). Accordingly, the out-of-court identifications by the Hubbards based on their selection from the photographic array were subject to a per se exclusion and, thus, should have been suppressed. We need not decide, however, if their admission created reversible error in light of our decision to grant the defendant a new trial because of our analysis of the other missteps in the trial.

Nevertheless, we conclude that the judge was correct in ruling that any subsequent identification of the defendant by the Hubbards would not have been tainted by any suggestiveness arising from their having viewed the wanted flyer because those identifications would have been based on an independent source. *Commonwealth* v. *Botelho*, 369 Mass. at 866. *Commonwealth* v. *Johnson*, 420 Mass. at 463. Based on the unusual circumstances in which the Hubbards had occasion to observe the defendant close up prior to and after the shooting, the Commonwealth sustained its burden of proving by clear and convincing evidence an independent source for the admissibility of the in-court identifications.[3] *Commonwealth* v. *Johnson*, 420 Mass. at 463. Compare *Commonwealth* v. *Jones*, 423 Mass. at 109.

For purposes of retrial, it was error to deny the motion to suppress relating to the Hubbards' out-of-court identifications, and an order allowing the motion to suppress should have entered relating to those identifications. There was no error in the order denying the motion to suppress the Hubbards' in-court identifications.

*Judgments reversed.*

*Verdicts set aside.*

---

[3]Although the judge uses the word "reliable" interchangeably with the words "independent source" in her findings, we conclude that her use of the word "reliable" is the equivalent of the words "independent source" based on her reliance on *Commonwealth* v. *Ross*, 361 Mass. 665, 671 & n.2 (1972), and the factors enumerated therein to determine whether to allow the admission of an identification.