COMMONWEALTH *vs.* CHRISTOPHER POGGI.

No. 00-P-552.

Norfolk. June 12, 2001. - January 31, 2002.

Present: PORADA, COWIN, & McHUGH, JJ.

*Identification. Constitutional Law,* Identification. *Due Process of Law,* Identification. *Evidence,* Identification, Demonstration. *Practice, Criminal,* Identification of defendant in courtroom, Argument by prosecutor.

At a criminal trial, in which the outcome of the entire case turned on the question of identification, the judge erred in excluding the defendant's attempt to display to the jury the tattoos on his forearm as a means of rebutting eyewitness identifications of him, where the display was demonstrative rather than testimonial, and where there was enough evidence that the defendant had the tattoos at the time of the crime to require at least a voir dire to determine the adequacy of the foundation for admitting the evidence. [686-689]

In the absence of a motion to suppress or a motion for a new trial, this court was unable to conclude whether, at a trial for armed robbery, an array of six photographs shown to witnesses, in which only the defendant was pictured in the same color shirt as was worn during the crime and in which only the defendant is shown as having a "goatee" similar to the one worn by the robber, was impermissibly suggestive. [689-694]

This court concluded that at a possible retrial of an indictment charging armed robbery, should photographic identifications of the defendant be suppressed, there must be a determination whether in-court identifications of the defendant were the product of an independent source [694-695]; given the possibility of a retrial, this court also addressed certain aspects of the prosecutor's closing argument [695-696].

INDICTMENT found and returned in the Superior Court Department on March 19, 1998.

The case was tried before *Suzanne V. DelVecchio,* J.

*Chauncey B. Wood* for the defendant.

*James A. Reidy,* Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury of armed

robbery. He contends that it was error to exclude his attempt to display to the jury the tattoos on his forearms as a means of rebutting eyewitness identifications of him as the robber. In addition, he asserts that the failure to suppress photographic identifications of him created a substantial risk of a miscarriage of justice because the photographic array shown to the witnesses by the police was impermissibly suggestive, and consequently that subsequent in-court identifications should have been excluded because it was not shown by clear and convincing evidence that they were based on independent sources. Finally, he attacks the prosecutor's closing argument as unfairly prejudicial on five different grounds.

We hold that a sufficient foundation to allow the display of the defendant's tattoos was established, and therefore, that it was error not to permit him to show the tattoos to the jury. In addition, we conclude that the photographic array had the potential to produce a misidentification. However, in the absence of a motion to suppress or a motion for new trial which would have generated evidence and findings on the subject, we are not in a position to make a final evaluation on the matter. Likewise, because the validity of the photographic array was assumed, no evidence was presented regarding the in-court identifications and we cannot make a determination of their validity. Accordingly, we vacate the conviction. If there is to be a retrial, the photographic identifications and, if necessary, the independent basis for in-court identifications should be considered before that trial begins.[1] We set forth the material facts, which are undisputed, as necessary throughout the opinion.

1. *Display of the defendant's tattoos.* On July 10, 1997, at about 6:30 P.M., a man entered Dependable Cleaners in Milton and asked to use the telephone. He was directed to a telephone at a store across the street, and he departed. However, he returned at about 7:00 P.M. (the store's closing time), pulled out a handgun, and demanded that the store's employees fill a plastic bag (which he provided) with cash from the cash registers. At the time of the robbery, five employees and one

---

[1]Because we reverse on other grounds, it is not necessary to conduct an in-depth analysis of the defendant's attacks on the prosecutor's closing argument. We address the subject matter briefly in the event there is a retrial.

customer were present. The intruder was not known by any of the witnesses. The employees complied with the demand for the cash, and the intruder left. There was testimony that the entire incident lasted less than five minutes.

The police were called, and the witnesses provided descriptions of the robber. Five of the six witnesses described the intruder as "husky," "heavy set," or having a "gut." The sixth described him as weighing 180-200 pounds. Estimates of his height ranged from five feet, eight inches to five feet, ten inches. All described him as wearing a dark shirt, with four characterizing the shirt as black, one describing it as blue, and one calling it merely dark. Likewise, all indicated that the robber had facial hair, but no mustache. In this regard, four described the facial hair as a "goatee," while two described it merely as a "beard." The robber was also described as wearing a short-sleeved shirt.[2] None of the witnesses present at the robbery described the robber as having tattoos on his forearms.[3] The judge, sustaining an objection by the Commonwealth, refused to permit the defendant to show the tattoos on his forearms to the jury as a means of demonstrating that he did not conform to the witnesses' description.[4]

The defendant did not take the witness stand. His desire to show the tattoos to the jury requires us to address whether the proposed display is "testimonial" or "demonstrative." If testimonial, it was properly excluded. The defendant was constitutionally entitled not to testify. However, if he chose to testify, he was subject to cross-examination as any other witness. He could not provide testimony, even of a limited nature, and then reassert the privilege in order to insulate himself from questioning by the Commonwealth. *Commonwealth* v. *Happnie*, 3 Mass. App. Ct. 193, 198-199 (1975).

---

[2]One witness described the garment as a short-sleeved shirt, while three witnesses described it as a "T-shirt."

[3]It is likely that such tattoos would have been noticed by one or more of six witnesses, since the robber was described as wearing a short-sleeved shirt and holding a gun in his hand.

[4]Reference was made just prior thereto to a tattoo consisting of three black bands on the defendant's left wrist, with the witness testifying that he did not recall whether the robber had such a tattoo. The judge then excluded a more formal display of this and other tattoos.

That said, we do not characterize the defendant's proposed display of the tattoos on his forearms as testimonial. No speaking or writing was contemplated. The demonstration seems to us to be more akin to a display of the defendant for the purpose of revealing or examining some physical characteristic, such as height, weight, or other physical feature. This is permitted routinely and is not viewed as testimonial or requiring an opportunity to cross-examine. See *Commonwealth* v. *Kater*, 388 Mass. 519, 533 (1983).

That leaves only the question whether there was an adequate foundation in the evidence in order to satisfy the requirement that the display of the defendant's tattoos be relevant to an issue in the case. Here, that means that there had to be evidence that the defendant had the tattoos at the time of the robbery, and that the tattoos would have been reasonably visible to or noticeable by the victims. Otherwise, the presence of the tattoos at the time of trial was irrelevant, and display of them threatened to become testimonial since the jury might infer from the display that they in fact existed and were visible at the time the crime was committed.

Unlike the circumstances in *Commonwealth* v. *Happnie, supra*, here there was evidence that the defendant had the tattoos on his forearms on July 10, 1997, the date of the robbery. A defense witness testified that on July 10, 1997, the defendant had a tattoo on his left wrist which resembled a brick wall and a big, mechanical-looking tattoo running the length of his right forearm. In addition, medical records from 1996 that were admitted in evidence referred to tattoos on both arms. There should at a minimum have been a voir dire to determine the adequacy of the foundation. Absent a conclusion that a foundation was lacking, the evidence should have been presented to the jury, particularly where the outcome of the entire case turned on the question of identification.

The fact that there was a brief, passing reference to the smaller tattoo on the defendant's left wrist did not compensate for the erroneous exclusion. The defendant was entitled to a reasonable opportunity to make his best case, including the proposition that his tattoos were so obvious that, had he been the robber, at least one of the witnesses would have observed

them. The chance that the defendant was identified as the robber inaccurately is more than hypothetical. While the witnesses identified the robber as being between five feet, eight inches and five feet, ten inches in height, the defendant was actually much taller. In addition, the case turned entirely on identification, there being no other evidence that the defendant was the perpetrator. The error was not harmless. We are unable to say "with fair assurance . . . that the judgment was not substantially swayed by the error." *Commonwealth* v. *Federico*, 425 Mass. 844, 852 (1997), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

2. *The photographic array.* One week after the robbery, the customer who had been present during the incident assisted the police in developing a composite sketch of the perpetrator. As part of the process, the police showed the customer a series of photographs. The customer did not identify any of them as the robber, but stated that one photograph was "fairly close." The police used the facial features of the person in that photograph as a basis for a composite. A Milton police officer saw a copy of the composite posted in the police station and reported that it appeared to be the defendant (with whom the officer had attended high school).

On the basis of this report, the police selected six photographs, including a photograph of the defendant but not including a photograph of the person who was the basis for the composite. While four of the six men pictured have facial hair, only the defendant can genuinely be described as having a "goatee." Likewise, only the defendant is pictured wearing a dark shirt. The photographs were shown first to the customer, who selected the defendant as the robber. The customer testified that the defendant's photograph was closer than the others to the likeness in the composite.

Subsequently, the six photographs were shown to the five employees who had been present at the time of the robbery.[5] Three identified the defendant's photograph as that of the robber. Two were unable to identify the robber from any of the

[5]The employees had earlier been shown the array shown to the customer at the time he assisted in the preparation of the composite. There were no identifications from that array.

photographs. Almost sixteen months later, the police showed a different array, which included a photograph of the person who was the basis for the composite, to one of the employees who had been unable to make an identification earlier. The employee identified the person who was the basis for the composite as the robber.

The customer and two of the employees also made an in-court identification of the defendant. One employee who identified the defendant's photograph was not asked to make an in-court identification. Of the two employees who were unable to identify a photograph of the robber, one was not asked for an in-court identification, and one testified that she did not know whether the robber was in the courtroom. There was no objection by the defendant either to the identification and admission of his photograph or to the in-court identification.[6]

On appeal, the defendant asserts that a motion to suppress the identification of his photograph should have been filed, and that that motion would have been allowed because the array leading to the identification was impermissibly suggestive. *Commonwealth* v. *Thornley*, 400 Mass. 355, 362-364 (1987) (*Thornley I*). He argues further that, had the array been found suggestive and the photographic identification suppressed, the in-court identifications would also have been excluded because the Commonwealth would have been unable to establish by clear and convincing evidence that those identifications had a source independent from the tainted photographic identification. *Commonwealth* v. *Botelho*, 369 Mass. 860, 868-870 (1976).

Our consideration of these issues is complicated by the fact that they were not raised in the court below, either by a motion to suppress, by objection at the time the evidence was offered, or by a motion for new trial. Thus, the judge below had no opportunity to rule on the matter, and we do not have the benefit of findings she otherwise would have made on the subject. However, because of the potential significance of a suggestive array in generating a conviction, the absence of an objection below cannot preclude appellate examination of the circumstances to ensure that there has not been a substantial risk of a

---

[6]The defendant pressed certain pretrial motions regarding the "sanitizing" of the photographs, but at no time objected to their introduction per se.

miscarriage of justice. See *Commonwealth* v. *Lee*, 32 Mass. App. Ct. 85, 86 (1992) (appellate court must decide "whether there is a reasonable likelihood that, if a pretrial motion to suppress had been filed, it would have been allowed"). Thus, having viewed the array, we think it appropriate to offer certain observations on the issue.

The standards governing the use of photographic arrays are easier to state than to apply. There is a denial of due process when procedures involved in the showing of a photographic array are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States*, 390 U.S. 377, 384 (1968). *Commonwealth* v. *Melvin*, 399 Mass. 201, 205 (1987). An array of photographs that distinguishes one suspect from all the others on the basis of some physical characteristic is discouraged. See *Commonwealth* v. *Melvin*, 399 Mass. at 207 n.10; *Commonwealth* v. *Thornley*, 406 Mass. 96, 100 (1989) (*Thornley II*). However, it is the totality of the circumstances attending the identification that determines whether the identification procedure is impermissibly suggestive. See *Commonwealth* v. *Botelho*, *supra* at 867; *Commonwealth* v. *Melvin*, *supra* at 206. Weight may be given to evidence that a witness did not rely upon the suggestive element in making the identification. *Commonwealth* v. *Mobley*, 369 Mass. 892, 896 (1976). Should the defendant show by a preponderance of the evidence that the procedure was impermissibly suggestive, the photographic identification must be excluded regardless of other indicators of its reliability. See *Commonwealth* v. *Botelho*, *supra* at 867-868; *Commonwealth* v. *Johnson*, 420 Mass. 458, 463 (1995); *Commonwealth* v. *Day*, 42 Mass. App. Ct. 242, 249-250 (1997).[7]

Application of these principles has yielded a variety of results. Identification of the defendant from an array in which the defendant was the only one pictured wearing a ski cap (a ski cap having been worn by the perpetrator) was held not impermissibly suggestive where the witness testified that he was

---

[7]The Federal rule differs. There, a photographic identification that results from an impermissibly suggestive procedure may still be admitted if there is other evidence that the identification is reliable. *Manson* v. *Braithwaite*, 432 U.S. 98, 114 (1977).

not looking for a hat when he examined the pictures. *Commonwealth* v. *Mobley, supra* at 896. Admission of an identification was upheld when only three of forty-four photographs pictured men with "scraggly" beards, a characteristic of the offender. *Commonwealth* v. *Napolitano*, 378 Mass. 599, 602-603 (1979). Where the defendant was the only individual in the array who was photographed with his arm in a sling, the identification was not deemed impermissibly suggestive in light of the witness's assertion that he had not identified the defendant on that basis. *Commonwealth* v. *Melvin, supra* at 206-207. See *Commonwealth* v. *Clark*, 378 Mass. 392, 399-401 (1979) (not impermissibly suggestive where defendant appeared in two snapshots out of eleven and there were also differences in types of pictures, where witness testified he chose photograph because of defendant's facial characteristics); *Commonwealth* v. *Paszko*, 391 Mass. 164, 169 (1984) (that defendant was only one who appeared in each of two arrays was not by itself sufficient to require exclusion of identification).

In contrast, in *Thornley I*, 400 Mass. at 364, and *Thornley II*, 406 Mass. at 182, the Supreme Judicial Court first remanded, then reversed, where an identification was admitted based on a photographic array in which the defendant was the only one of thirteen pictured wearing glasses. The perpetrator had also worn glasses. Unlike earlier cases cited above, the fact that the individual wore glasses was a factor in the identification. *Thornley I, supra* at 364. After remand and clarification of findings by the Superior Court judge, the conviction was reversed, the Supreme Judicial Court holding that, in the absence of evidence that the witness had not relied on the distinctive feature, the array was impermissibly suggestive. *Thornley II, supra* at 98-100. See *Commonwealth* v. *Day*, 42 Mass. App. Ct. at 249 (impermissibly suggestive where witnesses were exposed to police flyer containing same photograph as that they subsequently selected from six-person array).

In the present case, the witnesses were consistent in describing the robber as heavy set or husky, five feet, eight inches or five feet, ten inches in height, having a beard (with four of the six characterizing the beard as a "goatee"), and wearing a dark shirt. A composite was prepared based upon the customer's

recollection of the robber's description, and with the photograph selected by the customer as a basis. The customer stated that the robber's goatee was a feature that he had specifically noticed at the time of the incident. As indicated, three other witnesses also referred to the robber's facial hair by the term "goatee." The composite generated an opinion by a single police officer that it was a picture of the defendant.

To this point, the process was unexceptionable. Faced with a robbery committed by an individual unknown to the victims, the police followed proper procedures and obtained a hypothetical identification based on a composite sketch which in turn was based on observations of the robber by the victims during the incident. It was at this point that the process reached its critical stage.

A composite is by its very nature imprecise. Even if the descriptions on which it is based are accurate, these descriptions cannot be perfectly reflected in what is essentially a drawing. Identification of a suspect from the composite (often, as here, on the basis of the judgment of one person) adds an additional element of uncertainty. Thus, it is vital that the identification from the composite not become the product of a self-fulfilling prophecy. Procedures applied from this point forward must be designed truly to test the hypothetical identification, not merely to endorse a preconceived view that a given suspect is actually the perpetrator.

We are not convinced that the photographic array containing the defendant's photograph, considered alone, provided a fair test of the hypothesis. The array contained only six pictures. In this regard, see Commonwealth v. Allen, 22 Mass. App. Ct. 413, 414-417 (1986) (array with five permitted, but court suggested it should have been larger). The pictures were, typically, head and shoulder photographs which revealed little about the individuals' height and only slightly more about their body type.[8] Accordingly, the other elements of the witnesses' descriptions, specifically, the goatee and the dark shirt, took on greater importance.

---

[8]The pictures are before us and we are able to make judgments about them in light of other evidence in the record. Commonwealth v. Clark, supra at 397 n.8.

Of the six photographs, four of the subjects were pictured wearing white shirts, and one was wearing a gray shirt. Only the defendant was pictured wearing a shirt that is black, blue, or dark (the adjectives chosen by the witnesses). Likewise, only one of the subjects, again the defendant, wore what may accurately be described as a goatee, meaning a trimmed beard that comes to a point. Two were clean-shaven, two others had facial hair that had no characteristics of a goatee, and one had a fuller beard that would not likely be described as a goatee. We recognize that these features are not permanent. Beards can be grown, changed, or shaved off. Clothing can obviously be altered. But the fact remains that these features were not altered in the photograph that was selected. Nor was that photograph accompanied by other photographs that contained similar features and that would have provided a sterner test of the hypothesis that the defendant was the perpetrator.

In the absence of a motion to suppress or a motion for new trial, we lack the testimony and findings that would enable us to rule on the admissibility of the photographic identifications given the suspect character of the array. In the *Mobley, Melvin,* and *Clark* cases, witnesses testified that the distinctive feature in each of these arrays had not influenced them, and admission of the identifications was upheld. In *Thornley II,* witnesses revealed that they had relied on the distinctive feature in making their identifications, and the court ruled that these identifications should have been excluded. In the present case, we have no testimony of either kind. There having been no objection by the defendant to the array, the prosecutor could not have been expected to make such inquiries of the witnesses, nor could the judge have been expected to introduce the subject on her own. Consequently, the decision whether this array was impermissibly suggestive under the circumstances cannot be made at the appellate level on this record. Should there be a retrial, the issue will no doubt receive the careful attention of court and counsel.

3. *The in-court identifications.* Three of the witnesses identified the defendant in court. Had the photographic identifications been suppressed, it does not follow automatically that the in-court identifications had to be excluded. However, under such circumstances, the Commonwealth would have had the burden

of demonstrating by clear and convincing evidence that the source of the in-court identifications was independent of the tainted photographic array. See *Commonwealth* v. *Botelho, supra* at 868; *Commonwealth* v. *Johnson*, 420 Mass. at 463. Should a retrial result in suppression of the photographic identifications, there must be a determination whether any identification of the defendant subsequent to the tainted photographic identifications is the product of an independent source.

4. *The prosecutor's final argument.* Given the possibility of a retrial, we address briefly the allegations of improprieties in the prosecutor's final argument. The prosecutor's reference to a picture of the defendant as a "booking photo" was improper, but probably inadvertent. We assume it will not be repeated. Her statement in regard to the composite drawing ("This is — and you can find that this is — the Defendant. Look at him. It's the Defendant") was permissible argument upon the identification evidence. It was not "vouching" in the sense of expressing a personal opinion of the accuracy of a witness's testimony. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998).

The prosecutor's reference to the employee witnesses as "little girls" and "babies" (somewhat hyperbolic in light of their ages) was, if said for the purpose of eliciting sympathy for the victims, improper. The issue before the jury was not the understandable effect on the witnesses in being held up at their place of employment. The question was whether this defendant did it. The Commonwealth argues that the characterizations were a response to the .defendant's attempt to discredit the victims' identification. We have some difficulty in understanding how viewing the witnesses as "little girls" or "babies" enhances confidence in their abilities to provide an accurate description of the defendant. At a minimum, care should be taken that sympathy-inspiring terms are not casually used when they have no meaningful bearing on the guilt or innocence of the accused.

The prosecutor's response to defense counsel's arguments regarding "parlor games" and a witness's dentist appointment was harmless in context, and it seems overly sensitive to view it as a personal attack on the defense attorney. Nor was it error to make the somewhat innocuous point that one defense witness

had not buttressed her recollection of the date by producing that day's dental records. The rhetorical question could not have been perceived by the jury as a comment upon the defendant's failure to produce evidence. See *Commonwealth* v. *Habarek*, 402 Mass. 105, 110-111 (1988).

*Judgment reversed.*

*Verdict set aside.*