SUPERIOR COURT 
 
 COMMONWEALTH vs. SAGE BALLARD

 
 Docket:
 2081CR0308
 
 
 Dates:
 November 2, 2021
 
 
 Present:
 David A. Deakin Associate Justice
 
 
 County:
 MIDDLESEX, ss.
 

 
 Keywords:
 OMNIBUS MEMORANDUM AND ORDER ON DEFENDANT’S MOTIONS TO SUPPRESS IDENTIFICATION, GPS INFORMATION, AND EVIDENCE SEIZED PURSUANT TO A SEARCH WARRANT
 
 

             The defendant, Sage Ballard, is charged by indictment with nine offenses in connection with a May 2, 2020, shooting at the intersection of Harvard and Portland Streets in Cambridge.[1] The indictment alleges that, in the evening of the day in question, Leo Smothers was driving an automobile in Cambridge with a passenger, Eric Goncalves. After they passed a group of people that briefly attracted Smothers’s attention, the two stopped at a traffic light. While stopped, Smothers saw that one of the men in the group that he had noted was approaching them from the rear and firing a gun at his car. Understandably frightened, Smothers drove away quickly. Roughly twenty minutes after the shooting, he approached police officers in Boston and told them what had happened. Those officers put him in touch with officers from Cambridge, who had already begun an investigation based on reports of shots fired there. Their investigation
 
-------------------------------------
 
[1] The indictment charges Ballard with: two counts of armed assault with intent to murder (G. L.c. 265, § 18(b)); two counts of assault with a dangerous weapon (G. L. c. 265, § 15B(b)); unlawful possession of a firearm (G. L. c. 269, § 10(a)); unlawful possession of a loaded firearm (G. L. c. 269, § 10(n)); use of a firearm while committing a felony (G. L. c. 265, § 18B); solicitation of tampering with evidence in an official proceeding (G. L. c. 274, § 8, Cl. 2); and unlawful possession of ammunition (G. L. c. 269, § 10(h)(1)).
 
                                                            -2-
 
included obtaining from the Electronic Monitoring Program of the Massachusetts Probation Service (“Probation”) two sets of global positioning system (“GPS”) location information in rapid succession. The first request was for a list of everyone in the area of the shooting at the time who was wearing a GPS monitoring device. The list included Ballard. The second request, made very shortly after the first, was for GPS location data for Ballard for a period from one hour before the shooting until one hour after.
            Later that evening, Smothers picked Ballard’s photograph from an array. Ballard has moved to suppress that identification, as well as the GPS location information that police obtained from Probation’s Electronic Monitoring Program without a search warrant, and similar GPS information that police obtained months later pursuant to a search warrant. Because the court finds that nothing about the photographic array shown to Smothers or Cambridge police officials’ collection of GPS data without a search warrant immediately after the shooting violated Ballard’s rights, the motions to suppress the photographic identification and the GPS location data gathered shortly after the shooting are DENIED. Because the court concludes, however, that the affidavit in support of the search warrant did not establish probable cause to believe that Ballard was the shooter, the motion to suppress the GPS data collected pursuant to a search warrant is ALLOWED.
 
                                                            -3-
 
BACKGROUND[2]
            At 7:16 p.m. on May 2, 2020, the Cambridge Police Department’s Shot-Spotter system alerted officers to shots fired near the intersection of Harvard and Portland Streets in Cambridge. Officers went there to investigate. They spoke to at least two witnesses, one of whom said that, while walking in the area with his partner, he saw a “black male” extending his arm toward a dark motor vehicle. Although the witness reported that he could not see a gun in the man’s hand, he heard gunshots at that moment. A second witness told police that he heard several gunshots and then saw a dark motor vehicle drive away from the area hastily. Surveillance video recovered later confirmed these accounts. They did not, however, reveal the shooter’s identity.
            Roughly twenty minutes after the gunshots were reported, Boston Police officers contacted their counterparts in Cambridge. They told the Cambridge officers that they had spoken to two men, Smothers and Goncalves, who reported that they had been shot at recently while driving in Cambridge. The Boston officers told Cambridge detectives that Smothers had described the shooter as “a young Hispanic male about 16 years old, with a gun in his hand, wearing a green camouflage jacket.” Aff. at ¶ 7.[3] Detectives from Cambridge, including Detective Melissa Miceli, went to Boston to speak with the two men. Detective Miceli saw two
 
-------------------------------------
 
[2] The facts set out in this section are taken from the testimony of Police Officers Melissa Miceli and Eddie Foster and Detective Michael Taylor, all of the Cambridge Police Department, and Officer Robert Pasqualino, of the Somerville Police Department. The court generally credits the officers’ testimony. As to Detective Taylor’s testimony that the defendant is 6’4” tall, the court takes him to have been testifying in reliance on Ballard’s “booking sheet,” which lists his height as 6’4”. Based on the court’s several opportunities to see Ballard standing in court, the court concludes that the defendant is not as tall as 6’4”. Thus, to the extent that Detective Taylor testified that the defendant is 6’4” tall, the court concludes that he is mistaken, not that he was deliberately testifying inaccurately.
 
[3] References to the affidavit of Detective Michael Taylor in support of the application for a search warrant in this case are denoted by the abbreviation, “Aff.,” followed by a paragraph citation.
 
                                                            -4-
 
bullet holes in Smothers’s black Mercedes, one in the right, rear of the automobile. She and another detective spoke to Smothers and Goncalves. Smothers told them that, while driving through Cambridge earlier in the evening, he had been shot at by a young man who had been standing with a group by the side of the road. He recounted that, as he and Goncalves drove by the group, one or more of its members gave them a “mean mug,” or hostile look. Smothers drove on without speaking with the group. When he stopped at a traffic light a short way down the road, he looked behind his car and saw a young man with his arm extended in their direction. He then heard gunshots and the sound of at least one bullet hitting his automobile. Frightened, he drove away quickly.
            Smothers described the shooter to the Cambridge detectives as “Spanish . . . or mulatto,” with a tan complexion, “a baby face,” no facial hair, “curly, Afro-type hair,” standing 5’6” to 5’7”, and wearing a camouflage-style windbreaker. Smothers agreed to accompany Cambridge detectives to the police station for a more detailed interview.[4] As they were heading to the station, the detectives accompanying Smothers learned that other officers had detained a potential suspect in the case. The detectives took Smothers to look at him.[5] Smothers told police that, although the man bore some general likeness to the shooter – including wearing a similar, military-style camouflage jacket, he was not the shooter. The group then proceeded to the police station in Cambridge, where Smothers was interviewed at greater length.
 
-------------------------------------
 
[4] The interview was recorded, and a copy of the recording was introduced in evidence as Exhibit 2.
 
[5] The evidence does not include the details of the show-up identification procedure. As Smothers told police that the man in the show-up identification was not the shooter, the details of the procedure are not significant to the suppression analysis.
 
                                                            -5-
 
            Meanwhile, another Cambridge Police officer, Eddie Foster, had gone to the scene, to secure it and began collecting evidence. Initially, he was looking for evidence of firearm discharges, but he did not find any. At one point, he was approached by an individual whom he knew but whom he did not identify at the hearing.[6] That person showed Foster a video recording that the person said had been taken earlier that day on a cellular telephone. The video recording depicted a group of people filming a music video. Foster recognized the location where the video recording had been made as the Newtown Court/Washington Elms Housing Development area of Cambridge, which is next to the scene of the shooting. In the video recording was a young man that Foster recognized as the defendant, Sage Ballard. He was wearing a green, hooded sweatshirt with a camouflage pattern. In one hand, he held a bottle of Patron Tequila. In the other, he held what appeared to Foster to be a firearm with a “silver slide” and a “teal or tiffany- blue grip.”
            While still at the scene of the shooting, Cambridge Detective Michael Taylor contacted the Massachusetts Probation Service’s Electronic Monitoring Program (“ELMO”) to determine whether anyone wearing a GPS monitoring device had been at or near the shooting scene. He requested records of any such person in the area from 7:00 to 7:30 p.m. As Taylor was making this request – or very shortly thereafter – a detective named Barkhouse[7] informed him that he had seen another cellular telephone video, apparently related, or identical, to the one that Foster had
 
-------------------------------------
 
[6] The individual also was not identified in Detective Taylor’s affidavit in support of his application for a search warrant. Detective Taylor did recite in the affidavit that the individual was “known to” Officer Foster.
 
            [7] The evidence does not include Detective Barkhouse’s given name.
 
                                                            -6-
 
been shown at the scene. Barkhouse also recognized Ballard in the video he was shown.8 Barkhouse told Taylor that he was familiar with Ballard and knew that he was then wearing a GPS monitoring device. Taylor then asked Probation for records of Ballard’s location between 6:30 and 8:30 that evening. Taylor did not obtain a warrant for either request. Six months later, on November 10, 2020, Taylor obtained a search warrant for Ballard’s GPS location information from 12:00 a.m. on May 2 to 8:45 a.m. on May 3, 2020.
            In his interview at the police station, Smothers described the shooter as a young man – no older than twenty-one – with a tan complexion, a slim build, a “baby face,” no facial hair, and “curly, afro-type hair.” According to Smothers, the shooter stood 5’6” to 5’7” tall. Smothers recalled that the shooter wore a green, camouflage windbreaker and blue jeans. Smothers described the shooter as appearing to be “Spanish or mulatto.”
            While he was at the police station, Smothers was asked to view an array that included Ballard’s photograph. Somerville Detective Robert Pasqualino, who was not otherwise involved in the investigation, administered the array. Smothers identified Ballard’s photograph as depicting the person who had fired shots at his automobile.
            The grand jury returned this indictment on October 30, 2020. After a delay caused by the COVID-19 pandemic, Ballard was arraigned in this court on December 11, 2020. On May 19, 2021, counsel for Ballard filed three motions to suppress: a Motion to Suppress Identification (Paper No. 19), a Motion to Suppress GPS Information Obtained by Cambridge Police (Paper
 
-------------------------------------
 
[8] Detective Taylor testified that the Cambridge Police subsequently were sent a copy of the video shown to Detective Barkhouse at the scene. A copy of that video was introduced as Exhibit 4. Officer Foster testified that he saw that video and that it appeared to have been taken at roughly the same time as the video that he had been shown at the scene by the unnamed individual. He was not able to say whether it was the same video he had seen. He concluded, however, that it had been taken at roughly the same time because the people depicted in the video were the same, were dressed the same, and appeared to have been engaged in essentially the same activities.
 
                                                                        -7-
 
No. 23), and a Motion to Suppress Evidence Seized Pursuant to the Search Warrant and the Fruits Thereof (Paper No. 21). The court held a consolidated hearing on all three motions on September 8, 2021. Testifying were Professor Deah Quinlivan, an expert in eyewitness identification called by the defense,[9] Officers Miceli and Foster, and Detectives Taylor and Pasqualino, all called by the Commonwealth. Fourteen exhibits were introduced. The court took all three motions under advisement.
ANALYSIS
I. THE MOTION TO SUPPRESS IDENTIFICATION
            Ballard challenges Smothers’s identification of his photograph in the array on the grounds that the composition of the array was unduly suggestive and that it was shown to him improperly. From this, he argues, flows the conclusion that Smothers should not be permitted to attempt to identify him in court. Cf. Commonwealth v. Johnson, 473 Mass. 594, 602 (2016) (in- court identification following unduly suggestive out-of-court identification permissible only if Commonwealth proves by clear and convincing evidence that it rests on independent source).[10] Because the court concludes that neither the composition of the photographic array nor the manner in which it was shown to Smothers rendered it unduly suggestive, the Motion to Suppress Identification is DENIED.
 
-------------------------------------
 
[9] Professor Quinlivan’s work on issues in eyewitness identification has more than once been cited by the Supreme Judicial Court. See, e.g., Commonwealth v. Johnson, 473 Mass. 594, 600 (2016), citing Commonwealth v. Crayton, 470 Mass. 218, 239 (2014), quoting Wells & Quinlivan, Suggestive Eyewitness Identification Procedures and the Supreme Court’s Reliability Test in Light of Eyewitness Science: 30 Years Later, 33 Law & Hum. Behav. 1, 12 (2009).
 
[10] The Commonwealth has not argued that there is an independent source for Smothers’s potential in-court identification of Ballard. That said, because the court concludes that the photographic array was not impermissibly suggestive, the court need not reach this issue. Whether Smothers is permitted to attempt to identify Ballard at trial is an issue for the trial judge. See Commonwealth v. Dew, 478 Mass. 304, 315-316 (2017) (even in cases in which witness has made an unequivocal out-of-court identification, judge retains discretion to exclude in-court identification on fairness grounds).
 
                                                            -8-
 
            Under art. 12 of the Massachusetts Declaration of Rights, the court must exclude eyewitness identifications conducted by law enforcement officials that are impermissibly suggestive. See Johnson, 473 Mass. at 596-597. Such an identification is one that results from a procedure that was “so unnecessarily suggestive and conducive to misidentification that its admission would deprive the defendant of his right to due process.” Id. at 597, quoting Commonwealth v. Walker, 460 Mass. 590, 599 (2011). The court makes this determination by considering “the totality of the circumstances,” and the defendant bears the burden of establishing by a preponderance of the evidence that the identification procedure was impermissibly suggestive. Id. A photographic array that “distinguishes one suspect from all the others on the basis of some physical characteristic is discouraged.” Commonwealth v. Poggi, 53 Mass. App. Ct. 685, 691 (2002), citing Commonwealth v. Melvin, 399 Mass. 201, 207 n.10 (1987), and Commonwealth v. Thornley, 406 Mass. 96, 100 (1989) (Thornley II).
            A. The Composition of the Array
            Ballard contends that five aspects of the photographic array in this case impermissibly singled out his photograph from the others. These are: (1) the lightness of his skin, compared to the other subjects, (2) how brightly lit his face is in the photograph, again compared to the other subjects, (3) the extent of his smile, compared to the other two subjects smiling in their photographs, (4) the length of his hair, compared with all but one of the other subjects, and (5) the purported similarities between the clothing that he is wearing in the photograph and the clothing worn by the shooter. The court concludes that only one of these factors – how brightly lit Ballard’s face is in the photograph – can be said to distinguish his photograph at all from the others in the array. This mildly suggestive feature of the array does not require suppression of Smothers’s identification of Ballard.
 
                                                            -9-
 
            As to Ballard’s skin tone, it is lighter than that of several of the subjects. It is not, however, significantly lighter than those of the subjects in photographs A, B, C, or G. Moreover, it is difficult to distinguish how much of any apparent difference in skin tone among those five individuals reflect actual differences as opposed to differences resulting from lighting. See infra.
            In his photograph, Ballard is, indeed, smiling noticeably. So, too, however, are most of the other subjects in the array. There is nothing in Ballard’s facial expression that distinguishes his photograph from most of the others.
            Similarly, most of the subjects in the array have hair that is, if not long, certainly not short. Ballard’s hair is as long, or longer than the other subjects in the array. Another subject, B, has hair at least as long as Ballard’s, and several others – A, C, D, G, and H – have hair that is at least fairly long. Again, nothing about the length of Ballard’s hair distinguishes him from the other subjects.
            Finally, Ballard contends that, among the subjects in the array, his clothing is most like that worn by the shooter, a military camouflage-style jacket or windbreaker. Six of the participants in the array are pictured wearing hooded sweatshirts or similar garments. Some, like subjects A and F, are wearing hooded sweatshirts that are light enough in color that a viewer can see that they are not camouflage-patterned. Others, however, such as those worn by subjects C and H, are too dark to discern whether they are patterned. Ballard and subject G are the only two individuals apparently wearing jackets, and no one is wearing a windbreaker. Thus, the court is not persuaded that any of these attributes of Ballard’s photograph – either individually or collectively – “distinguishes [his photograph] . . . from all the others on the basis of some physical characteristic.” Poggi, 53 Mass. App. Ct. at 691.
 
                                                            -10-
 
            In Commonwealth v. Montez, 450 Mass. 736, 757 (2008), the Supreme Judicial Court rejected a challenge to a photographic array based, in part, on a claim that the defendant’s hair style distinguished his photograph from the others in the array. In doing so, the Supreme Judicial Court observed that,
[t]here necessarily will be differences in any photographic array . . . There is no requirement that the defendant’s image . . . be surrounded by people nearly identical in appearance to his own.
Montez, 450 Mass. at 757, citing Commonwealth v. Tanso, 411 Mass. 640, 652, cert. den. 505 U.S. 1221 (1992).
            The photographic array that police showed to Smothers could be said to be mildly suggestive in that Ballard’s face appears to be at least slightly more brightly lit in his photograph than the faces of the other seven subjects in the array. That said, the court does not conclude that this mildly suggestive effect is sufficient for Ballard to meet his burden of demonstrating that the photographic array from which Smothers selected his photograph was “so unnecessarily suggestive and conducive to misidentification that its admission would deprive the defendant of his right to due process.” Johnson, 473 Mass. at 596-597, quoting Commonwealth v. Walker, 460 Mass. 590, 599 (2011). The court, therefore, rejects Professor Quinlivan’s conclusion that, although the “nominal size of the array” was eight photographs, its “functional size” was one photograph – that is, that the identity of the individual suspected by police is clear from the array’s composition.
            B. The Administration of the Array
            Ballard also argues that Smothers’s identification of his photograph in the array was fatally flawed because Somerville Detective Pasqualino showed him the array twice. Pasqualino testified that he showed Smothers the photographic array sequentially – one photograph at a time
 
                                                            -11-
 
– twice. When Smothers did not make an identification after reviewing each photograph once, Smothers showed him the array again. Doing so was not prohibited by either the Somerville or Cambridge Police Departments’ policy on identification procedures. Professor Quinlivan testified that sequential arrays, such as the one used in this case, are preferable to simultaneous arrays because they reduce the likelihood that the witness will use a “multiple-choice-test” approach and select the photograph in the array that best matches the suspect, instead of selecting a photograph only if it matches the witness’s objective memory of the perpetrator. Professor Quinlivan also testified that witnesses should not be allowed to “go back through” the photographs.
            Her testimony on this point, however, was brief. She did not address at any length the degree to which showing a sequential array twice through would render the array less reliable than showing it only once. On this issue, therefore, Ballard has not met his burden of establishing by a preponderance of the evidence that permitting Smothers to view the sequential array twice through rendered it impermissibly suggestive.
            Finally, Ballard has not shown that the danger of unfair prejudice from a potentially erroneous identification substantially outweighs the probative value of Smothers’s identification of Ballard in the photographic array. See Commonwealth v. Carter, 475 Mass. 512, 518 (2016) (due process required exclusion of identification if its probative value is substantially outweighed by its risk of undue prejudice). For the reasons set out in this section and Section II, B, infra, Ballard has not met his burden of establishing this. The Motion to Suppress Identification is therefore DENIED.
 
                                                            -12-
 
II. THE MOTION TO SUPPRESS GPS INFORMATION OBTAINED BY CAMBRIDGE POLICE
            Ballard also challenges the Cambridge Police Department’s collection of GPS data about his whereabouts on May 2, 2020, without a warrant. His argument is based largely on the Supreme Judicial Court’s decision in Commonwealth v. Norman, 484 Mass. 330 (2020). He also alleges that, independent of the rule in Norman, the Cambridge Police Department violated his constitutional rights by obtaining GPS information regarding his location without a search warrant. The court is not persuaded by either argument.
            A. Application of Commonwealth v. Norman, 484 Mass. 330 (2020)
            In Norman, 484 Mass. at 331, the Supreme Judicial Court reiterated that imposition of GPS monitoring on a probationer was a search in the constitutional sense and held that, under the circumstances of that case, “imposition of the GPS device as a condition of pretrial release violated . . . art 14 of the Massachusetts Declaration of Rights” The Norman court observed that, in that case, the Commonwealth had failed to justify imposition of a GPS monitoring device on a pretrial detainee “who was not charged with a crime involving domestic abuse.” Id. at 337. This observation was critical to the outcome of the case because, as the Norman court noted, G. L. c. 276, § 58, expressly contemplates “conditions of release to be imposed in certain crimes involving domestic abuse ‘in order to ensure the safety of the alleged victim, any other individual or the community.” Id. (ellipses in original), quoting G. L. c. 276, § 58.
            The holding in Norman rests on the principle that, “[w]hen a search, such as GPS monitoring, is conducted as a pretrial condition of release, the only legitimate justifications for doing so are those authorized by statute; courts do not have inherent authority to impose pretrial conditions of release.” Id. at 336, citing Commonwealth v. Preston P., 483 Mass. 759, 763 (2020). In this case, however, the Commonwealth has established that, at the time of the
 
                                                            -13-
 
shooting, Ballard was required as a condition of his release to wear a GPS monitoring device because he was charged with “a crime involving domestic abuse.” Id. at 336. See Cambridge District Court Docket 1952CR0941. As G. L. c. 276, § 58, contemplates the imposition of pretrial conditions of release to protect victims of domestic abuse, and, as the record of Ballard’s arraignment in District Court establishes that the GPS condition was imposed to protect the victim in that case, a young woman with whom Ballard had been in a long-term relationship, the Commonwealth has established that there was no Norman violation in this case.
            B. The Exigency Exception to the Warrant Requirement
            The Commonwealth properly concedes that the Cambridge Police Department’s request to ELMO for GPS location information for anyone wearing a GPS monitoring device in the area of the shooting at the time and its subsequent request for similar information about Ballard for a two-hour period around the time of the shooting were searches in the constitutional sense. See Commonwealth v. Augustine, 467 Mass. 230, 255 (2015) (“government-compelled production of the defendant’s CSL records . . . constituted a search in the constitutional sense to which the warrant requirement of art. 14 applied”). The Commonwealth also concedes that the Cambridge Police Department did not have a warrant to obtain the GPS location information. The Commonwealth contends, however, that there was probable cause to believe that the records would reveal the shooter’s identity and that the warrantless search was justified by the exigency of the situation. The court agrees.
            The Fourth Amendment to the United States Constitution and article 14 of the Massachusetts Declaration of Rights guarantee citizens’ rights to be free from unreasonable searches and seizures. See Commonwealth v. Tavares, 482 Mass. 694, 702 (2019). “A warrantless search is ‘per se’ unreasonable under the Fourth Amendment.” Commonwealth v.
 
                                                            -14-
 
Davis, 481 Mass. 210, 217 (2019), quoting Commonwealth v. Perkins, 465 Mass. 600, 603 (2013), Katz v. United States, 389 U.S. 347 (1967). Thus, in seeking to justify a warrantless search, the Commonwealth bears the burden of demonstrating that it “‘falls within a narrow class of permissible exceptions’ to the warrant requirement.” Perkins, 465 Mass. at 603, quoting Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974). One of these exceptions is when an emergency situation creates exigent circumstances that render it “impracticable for the police to obtain a warrant.” Commonwealth v. Almonor, 482 Mass. 35, 49 (2019), citing Commonwealth v. Alexis, 481 Mass. 91, 96 (2018). The standards for evaluating whether the Commonwealth has established that exigent circumstances existed “are strict.” Id.
            In determining whether exigent circumstances justify a warrantless search, a court considers the situation “as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis.” Id. at 50, quoting Commonwealth v. Young, 382 Mass. 448, 456 (1981). The court thus considers “the totality of the circumstances.” Id., citing Commonwealth v. Forde, 367 Mass. 798, 801 (1975). Courts assessing a claim of exigency generally consider “whether police had ‘reasonable grounds to believe that obtaining a warrant would be impracticable under the circumstances because the delay in doing so would pose a significant risk that [(1)] the suspect may flee, [(2)] evidence may be destroyed, or [(3)] the safety of the police of others may be endangered.’” Id. (brackets in original), quoting Commonwealth v. Figueroa, 468 Mass. 204, 213 (2014).
            In this case, the Commonwealth has met its dual burden to show probable cause to believe that Ballard was the shooter and that exigent circumstances justified the warrantless
 
                                                            -15-
 
request for GPS data regarding his location from one hour before to one hour after the crime.[11] The police knew that a man generally matching Ballard’s description (but see Section III, infra) earlier that evening had fired at an automobile in Cambridge. They knew that Ballard had been captured in a video recording made earlier that day holding what appeared to be a firearm. They knew that the shooter remained at large, and they had no information as to whether the shooter was still armed. Under these circumstances, the police had probable cause to believe that Ballard’s GPS location data would either inculpate or exculpate him in connection with the shooting and, if inculpatory, might help them to locate him. Further, they had reason to believe that the shooter might flee, that evidence might be destroyed, and that an armed gunman was still on the loose. Under the circumstances, which are comparable to those in Almonor, the Detective Taylor was justified in concluding both that there was probable cause to believe that Ballard was the shooter and that exigent circumstances justified a warrantless request for GPS location data for him. The Motion to Suppress GPS Information Obtained by Cambridge Police is therefore DENIED.
III. THE MOTION TO SUPPRESS GPS DATA OBTAINED BY THE CAMBRIDGE POLICE
            DEPARTMENT PURSUANT TO A SEARCH WARRANT
            Last, Ballard challenges the Cambridge Police Department’s acquisition of his GPS monitoring system data pursuant to a search warrant months after the shooting. See 2052SW0115. Ballard’s challenge is twofold. First, he argues that Taylor knowingly or
 
-------------------------------------
 
[11] Neither party draws a distinction between the Cambridge Police Department’s first request for GPS data – for all individuals wearing GPS monitoring devices in the area of the shooting from roughly twenty minutes before the offense to ten minutes after – and its second request – for two hours of Ballard’s GPS location information. As the second request involves a substantially greater intrusion on Ballard’s expectation of privacy and presumably included all the information pertaining to Ballard in the first request and as the court concludes that the second request was justified under the exigent circumstances exception to the warrant requirement, the court does not separately analyze the initial, broader request for GPS data for anyone in the vicinity of the shooting between 7:00 and 7:30 p.m. on May 2, 2020.
 
                                                            -16-
 
recklessly misrepresented information in his affidavit in support of the application for a search warrant. Second, he contends that – with the purportedly offending misrepresentation(s) excised from the affidavit – what is left is insufficient to establish probable cause to establish a nexus between the crime and the information sought in the warrant. The court concludes that, although not a model of drafting, nothing in Taylor’s affidavit constitutes an intentional or reckless misrepresentation. The court, however, concludes that the information included in the search warrant affidavit – which was not all the significant information that the police had when Taylor submitted it – did not establish probable cause to believe that Ballard was the shooter. The Motion to Suppress Evidence Seized Pursuant to the Search Warrant and the Fruits Thereof is therefore ALLOWED.
            A. The Franks Hearing
            Ballard maintains that, because of several alleged misrepresentations in Taylor’s affidavit in support of the search warrant, he is entitled, under Franks v. Delaware, 438 U.S. 154, 164-165 (1978), to suppression of the records recovered pursuant to it. Under Franks, a defendant is entitled to suppression of evidence seized pursuant to a search warrant if the defendant can demonstrate by a preponderance of the evidence that an affiant applying for a search warrant made one or more intentionally or recklessly false statements in the affidavit and that, after excising the offending statements, the affidavit is insufficient to establish probable cause. Id. at 155-156. See also Commonwealth v. Reynolds, 374 Mass. 142, 149 (1977) (intentional misrepresentation in search warrant affidavit requires suppression).
            At the threshold, the court concludes that Ballard made the preliminary showing necessary to establish a right to a Franks hearing. The court, therefore, conducted one as part of the combined evidentiary hearings on the three motions to suppress. As Ballard argues, Taylor’s
 
                                                            -17-
 
statement in his affidavit that the “physical description [provided to Cambridge police by Smothers] is consistent with the physical description of Sage Ballard,” Aff. at ¶ 11, is not entirely accurate. The affidavit sets out Smothers’s description of the shooter: “Spanish or bi- racial, curly afro hair, 21 or 22 years old, baby face with no facial hair, wearing an army camouflage windbreaker[-]style jacket, blue jeans, maybe white shoes, brown eyes, tan complexion, slim build, 5’6” or 5’7” height.” Id. at ¶ 10. The heart of Ballard’s argument is that the booking form associated with his arrest in this case lists his height as 6’4”, a point that Taylor conceded on cross-examination. Although the court – having had the opportunity to see Ballard standing several times during the daylong hearing – concludes that he is not 6’4” tall but, instead, much closer to exactly six feet[12], it is nonetheless true that he is therefore five or six inches taller than the height estimated by Smothers in his statement to the police. Moreover, his booking photograph reflects that he had some facial hair, although nothing approaching a full beard or mustache.[13]
            Taylor’s representation in his affidavit that Smothers’ description of the shooter is consistent with Ballard’s appearance is, in turn, critical to the affidavit’s recitation of probable cause to believe that Ballard was the gunman.[14] Without it, the affidavit does not establish probable cause to believe that Ballard was the shooter.
 
-------------------------------------
 
            [12] See Note 2, supra.
 
[13] Ballard also argues that he was nineteen years old, not twenty-one or twenty-two (as Smothers told Cambridge detectives) or sixteen (as he reportedly told Boston Police officers), at the time of the shooting. The court is not persuaded that either of these is a significant enough disparity to warrant separate consideration. Finally, several other aspects of Smothers’s description, as recounted in the affidavit, are, indeed, consistent with Ballard’s appearance.
 
[14] Taylor’s characterization of Ballard’s appearance as “consistent” with the shooter’s description need not have been the subject of a Franks hearing at all. Had Taylor included in his affidavit – as he inexplicably did not – that Smothers identified Ballard’s photograph in an array as a photograph of the shooter, he would have minimized the significance of his opinion of the consistency between the two descriptions. The similarities and differences between the two descriptions would not have been nearly as significant to a finding of probable cause as they are had the issuing magistrate been apprised of Smothers’s identification of Ballard in a photographic array. In that event, it would have been difficult, if not impossible, for Ballard to argue persuasively that excision of the allegedly intentional or reckless characterization of the consistency in the two descriptions would have rendered the affidavit insufficient to establish probable cause. Thus, had the affidavit included evidence of Smothers’s photographic identification of Ballard, he would not have been entitled to a Franks hearing.
In a similar apparent omission, Taylor’s affidavit does not set out that Ballard’s GPS data – provided by ELMO at the time of the shooting pursuant to Taylor’s warrantless request (see Section II, supra) – placed him at the scene of the shooting at the time that it happened. This information certainly would have provided strong support for a finding of probable cause. It is unclear to the court whether the omission was deliberate (which is difficult to imagine) or an oversight, as seems much more likely.
 
                                                            -18-
 
            That Ballard was entitled to a Franks hearing does not, however, establish that suppression is indicated. That is because suppression requires that the court find that the affiant deliberately or recklessly misrepresented the facts. The court does not find that in this case. Rather, the court is persuaded that Taylor’s imprecise characterization of the consistency between the shooter’s description and Ballard’s appearance is the product of oversight. Taylor certainly could, and should, have taken more care to note the areas of dissimilarity – height and facial hair – between the two descriptions. That said, the court is mindful that, at the time that he drafted his affidavit, Taylor knew that Smothers had identified Ballard in a photographic array as the gunman. That Taylor inexplicably omitted this from his affidavit does not mean that the court should not consider it in assessing whether his characterization of the consistency between Smothers’s description of the gunman and Ballard’s appearance was intentional or reckless or, instead, merely careless. Compare Commonwealth v. Lowery, 487 Mass. 851, 856 (2021) (probable cause determination “begins and ends with the four corners of the affidavit,”), quoting Commonwealth v. Feranandes, 485 Mass. 172, 183 (2020), cert. denied, 141 S. Ct. 1111 (2021), with Commonwealth v. Long, 454 Mass. 542, 552 (2009) (“If a [Franks] hearing is ordered, the
 
                                                            -19-
 
defendant must show by a preponderance of the evidence that the false statement or misimpression created by an omission was made either intentionally or with reckless disregard for the truth.”), citing Franks, 438 U.S. at 156.
            Under the circumstances of this case – in which Taylor was aware that Smothers had identified Ballard in a photographic array but inexplicably neglected to include that information in his affidavit – the court concludes that Ballard has not met his burden of establishing by a preponderance of the evidence that Taylor’s imprecision in his characterization of the consistency between the shooter’s description and Ballard’s appearance was intentional or reckless. Instead, the court concludes that Taylor was not as careful as he might have been in the preparation of his affidavit. This conclusion is reinforced by Taylor’s failure to include in his affidavit that some of the same GPS records sought in the warrant – obtained lawfully without a warrant months earlier (see Section II, supra) – placed Ballard at or near the crime scene.
            B. Probable Cause
            That there is no basis under Franks for the excision from the search warrant affidavit of Taylor’s imprecise characterization of the consistency between Smother’s description of the gunman and Ballard’s appearance likewise does not end the inquiry. The court must also determine whether Taylor’s affidavit in support of his application for a search warrant establishes sufficient probable cause to believe that Ballard was the person who shot at Smothers’s car. Although the issue is a close one, the court concludes that the affidavit submitted fails to establish probable cause to believe that Ballard was the shooter and that, therefore, collection of his GPS data would yield evidence of the crime.
            In reviewing a motion to suppress evidence gathered pursuant to a search warrant, the court must determine whether the warrant was supported by probable cause “for the issuing
 
                                                            -20-
 
judge [or magistrate] to conclude that the police seek items related to criminal activity and that the items described ‘reasonably may be expected to be located in the place to be searched at the time the warrant issues.’” Commonwealth v. Perkins, 478 Mass. 97, 102 (2017), citing Commonwealth v. Valerio, 449 Mass. 562, 566 (2007). That determination is made from the “four corners of the [search warrant] affidavit.” Id. (parentheses in original), quoting Commonwealth v. O’Day, 440 Mass. 296, 297 (2003). In evaluating an affidavit in support of an application for a search warrant, a magistrate may draw reasonable inferences from the facts set out therein. See O’Day, 440 Mass. at 297. Affidavits supporting search warrant applications are reviewed “as a whole and in a common sense fashion.” Commonwealth v. Dorelas, 473 Mass. 496, 501 (2016), quoting Commonwealth v. Cavitt, 460 Mass. 617, 626 (2011). They are not to be “parsed, severed, and subjected to hypercritical analysis.” Id., quoting Commonwealth v. Donahue, 430 Mass. 710, 712 (2000).
            The affidavit at issue in this case sets out the details of the shooting and the eyewitness testimony that established that it occurred. Aff. at ¶¶ 5, 6. It includes the description that Smothers gave of the gunman to Boston Police officers and the more detailed description that he provided to Cambridge detectives. Id. at ¶¶ 7, 10. It explains that this description was “consistent with the physical description of Sage Ballard.” Id. at ¶ 11. The affidavit summarizes a video recording that an individual known to Officer Foster showed him in connection with the shooting. Id. at ¶ 12 The video depicted Sage Ballard, whom Foster recognized, wearing a green, camouflage hooded sweatshirt and holding what Foster believed was a firearm. Id. The video was taken in front of the Newtown Court/Washington Elms Housing development, which is next to the intersection where the shooting occurred. Id. The affidavit recites that Detective Barkhouse was aware that Ballard’s whereabouts were being monitored by a GPS device
 
                                                            -21-
 
attached to his body by ELMO. Id. at ¶ 17. This information was sufficient to establish a reasonable suspicion, but not probable cause, to believe that Ballard was the shooter. See Commonwealth v. Cartright, 478 Mass. 273, 283 (2017) (probable cause “requires more than mere suspicion but something less than evidence [that would be] sufficient to [sustain] a conviction”) (brackets in original), quoting Commonwealth v. Jewett, 471 Mass. 624, 629 (2015).
            The Commonwealth rests much of its argument to the contrary on the cellular telephone video recordings shown by unnamed witnesses at the scene, one of whom was known to Officer Foster but whose identity is not revealed in Taylor’s affidavit. These videos depict Ballard, wearing a green, camouflage-style hooded sweatshirt in the vicinity of the shooting on an unspecified date and time. In the video that Officer Foster was shown, he saw Ballard holding what appeared to be a firearm. In the related video or videos recovered by the Cambridge Police Department, no firearm was visible. As Ballard notes, the affidavit does not sufficiently establish the basis of knowledge and/or veracity of the unnamed individual(s) at the scene who showed Officer Foster and Detective Barkhouse a video (or videos) that the individual(s) said had been taken earlier that day.
            In relying on information provided by informants, police affiants preparing affidavits in support of search warrant applications must demonstrate the informants’ “basis of knowledge” and “veracity.” Commonwealth v. Upton, 394 Mass. 363, 373 (1985), citing Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969). See also Commonwealth v. Wilkerson, 486 Mass. 159, 170 (2020) (affirming Aguilar/Spinelli test for reliability of informant information). The Commonwealth submits that the informant known to Foster “was with the defendant prior to the shooting . . . and has a video of the defendant wearing the clothing
 
                                                            -22-
 
identified by other witnesses and security footage in the area” Opp. at p. 9.[15] The problem with the Commonwealth’s position is that the affidavit does not recite that the informant “was with the defendant prior to the shooting.” Id. As the court’s review of the search warrant application is “limited to the four corners of the affidavit,” Perkins, 478 Mass. at 102, citing Valerio, 449 Mass. at 566, the court cannot insert in the affidavit the clearly important information that the person who showed Foster the cellular telephone video recording had ever been “with the defendant.” There is simply no information in the affidavit (or the hearing record, for that matter) as to when the cellular telephone recording was made or how the informant came into possession of it.
            As to the informant’s veracity, the Commonwealth relies heavily on Foster’s knowledge of the informant’s identity. It is certainly true that a police officer’s knowledge of the informant’s identity is a factor that the court should consider in assessing the informant’s veracity. See Commonwealth v. Alfonso A., 438 Mass. 372, 376-377 (2003); Commonwealth v. Mendes, 78 Mass. App. Ct. 474, 482 (2010). It is insufficient, however, “standing alone to confirm the informant’s reliability.” Alfonso A., 438 Mass. at 376.
            The other factors that the Commonwealth argues confirm the informant’s reliability do not appear to withstand scrutiny. Thus, that police located a similar video does not bolster the informant’s reliability; nor does their review of security footage from the surrounding area that does not reveal the shooter’s identity. That Smothers’s description of the shooter is generally consistent with Ballard’s appearance might be said to support the informant’s reliability. Taken
 
-------------------------------------
 
[15] References to the Commonwealth’s Memorandum of Law in Opposition to Defendant’s Motion to Suppress Evidence (“Opposition,” Paper No. 32) are denoted by the abbreviation, “Opp.,” followed by a page citation. Note that the Opposition is not paginated; thus, the court’s page citations are produced by a manual count of the pages.
 
                                                            -23-
 
with Foster’s familiarity with the informant, however, this is insufficient to meet the standard set out in Aguilar/Spinelli.
            Even if this court were to conclude that the informant(s) was (were) reliable, however, the affidavit still does not establish probable cause to believe that Ballard was the shooter. The information set out in the affidavit linking Ballard to the shooting is that: (1) his appearance generally “is consistent” with Smother’s description of the shooter, Aff. at ¶ 11; (2) he appears in one or two videos taken near the shooting at some time prior to it wearing a green, camouflage- style jacket like the one worn by the shooter; and (3) in one of the videos, he appears to be holding a firearm. This information is sufficient to establish a reasonable suspicion that Ballard was the shooter; it does not establish probable cause to arrest him for that offense.
            Of course, other facts known to Detective Taylor at the time he prepared his affidavit would have shifted this analysis fundamentally. Had Taylor included Smothers’s identification of Ballard’s photograph as a photograph of the shooter, the court would not have had to engage in this analysis. Probable cause would have been established. The additional information that Ballard’s GPS location data – recovered almost immediately by the Cambridge police – placed him at the scene of the shooting would have made it a belt-and-suspenders situation. The court, however, is confined to the four corners of the affidavit. It established a reasonable suspicion that Ballard was the shooter but not probable cause to believe it. The Motion to Suppress Evidence Seized Pursuant to the Search Warrant and the Fruits Thereof is therefore ALLOWED.
CONCLUSION AND ORDER
            Because Ballard has not met his burden of establishing by a preponderance of the evidence that the composition of the photographic array shown to Smothers or its administration was impermissibly suggestive, the Motion to Suppress Identification is DENIED. Similarly,
 
                                                            -24-
 
because the Commonwealth has met its burden of establishing that the exigent circumstances exception to the warrant requirement justified the police’s gathering of limited GPS location data in the immediate aftermath of the shooting without a warrant, the Motion to Suppress GPS Information Obtained by Cambridge Police is also DENIED. Finally, because the information in the affidavit in support of the search warrant for Ballard’s GPS location data on May 2-3, 2020, does not establish probable cause to believe that Ballard was the shooter, the Motion to Suppress Evidence Seized Pursuant to the Search Warrant and the Fruits Thereof is ALLOWED.
 
/s/David A. Deakin Associate Justice
 
November 2, 2021
 
xxz